Dissenting opinion filed by Circuit Judge BROWN.
TATEL, Circuit Judge:
In 1971, after decades of conflict, the United States finally settled land claims staked by descendants of Alaskan aboriginal tribes. The U.S. Department of Interi- or had long interpreted this settlement to bar it from taking land into trust for Indian tribes in Alaska. In this case, several Alaska Native tribes sued the Department, challenging the regulation implementing *102 that prohibition. After the district court held that Interior’s interpretation was contrary to law, the Department, following notice and comment, revised its regulations and dismissed its appeal. The State of Alaska disagrees with both the district court and Interior, and now seeks to prevent any new efforts by the United States to take tribal land in trust within the State’s borders. Unfortunately for Alaska, which intervened in the district court as a defendant and brought no independent claim for relief, the controversy between the tribes and the Department is now moot. We therefore dismiss Alaska’s appeal for lack of jurisdiction.
I- ,
Like many Alaska Native tribes, the three tribes that initiated this litigation— Akiachak Native Community, Chalkyitsik Village, and Tuluksak Native Community — live in small villages reachable only by air and water. Compl. ¶¶ 24, 30, 41. These tribes, together with the Chilkoot Indian Association (collectively “Akiachak”), sought to persuade the Department of Interior to take certain land into trust — a form of restricted land ownership under which the United States possesses legal title to land for the benefit of Indian tribes. Id. ¶¶ 29, 36, 40, 42. They believed that trust status would “ensure [the] protection” of these lands “for future generations of tribal members,” id. ¶ 40, as well as allow them to “assert undisputed jurisdiction over [these] lands” and obtain federal enforcement of ordinances banning alcohol sales, id. ¶ 35.
Akiachak, however, faced a significant barrier .to this course of action: the Department of Interior had long maintained that it was legally barred'from procuring trust land in Alaska. See 25 C.F.R. § 151.1 (1980) (establishing that the Department of Interior’s land-into-trust regulations “do not cover the acquisition of land in trust status in the State of Alaska, except acquisitions for” one tribe lacking aboriginal claims). By filing this lawsuit, Akiachak set out to change that.
Some background is necessary to understand the basis for Akiachak’s claim to relief. Acquisition of Indian trust lands by the U.S. government has a long history. The Indian Reorganization Act of 1934 (IRA) authorizes the Secretary of the Interior to acquire trust lands, 25 U.S.C. § 465, and designate new Indian reservations, id. § 467. The IRA considers Alaska Natives to be Indians for purposes of the Act, id. § 479, but originally excluded Alaska, then a territory, from the trust acquisition provision, Indian Reorganization Act of 1934, Pub. L. No. 73-383, § 13, 48 Stat. 984, 986. In 1936, Congress extended the IRA’s trust authority to Alaska and authorized the Secretary to designate as reservations land that had been allocated for Indian use under prior statutes and executive orders, Act of May 1, 1936, Pub. L. No. 74 538, §§ 1, 2, 49 Stat. 1250, resulting in the designation of seven reservations and the acquisition of several other properties in trust, Akiachak Native Community v. Salazar (Akiachak I), 935 F.Supp.2d 195, 198 (D.D.C. 2013). Six decades later, in 1994, Congress added an antidiscrimination provision that prohibited the Department of Interior from “classifying], enhancing], or diminishfing] the privileges and immunities available to a federally recognized Indian tribe relative to the privileges and immunities available to other federally recognized tribes.” Act of May 31, 1994, Pub. L. No. 103 263, 108 Stat. 707, 709 (codified at 25 U.S.C. § 476(g)).
But these ownership schemes left unresolved many outstanding land claims by Alaska Natives based on aboriginal rights, that is, “possessory rights of Indian tribes to their aboriginal lands ... extinguishable *103 only by the United States.” Oneida Indian Nation of New York v. Oneida County, 414 U.S. 661, 667, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974). After Alaska became a state in 1959, this potential for outstanding aboriginal claims limited the U.S. government’s ability to transfer land to the new state under the Alaska Statehood Act. Conflict over the State’s land selections prompted Congress to pass the Alaska Native Claims Settlement Act (ANCSA) in 1971. “[D]e-signed to settle all land claims by Alaska Natives,” ANCSA extinguished aboriginal claims and revoked all designated reservations, except for one: the Annette Island Reserve inhabited by the Metlakatla Indians, who, as immigrants from Canada, had no aboriginal claims to Alaska lands. Alaska v. Native Village of Venetie Tribal Government, 522 U.S. 520, 523-24, 118 S.Ct. 948, 140 L.Ed.2d 30 (1998); Federal Appel-lees’ Br. 8. In exchange, Alaska Natives received approximately 44 million acres of land and $962.5 million, to be distributed through corporations owned by Alaska Native shareholders. Venetie, 522 U.S. at 524, 118 S.Ct. 948 (citing 43 U.S.C. §§1605, 1607, 1613). Congress declared that the settlement
should be accomplished rapidly, with certainty, in conformity with the real economic and social needs of Natives, without litigation, with maximum participation by Natives in decisions affecting their rights and property, without establishing any permanent racially defined institutions, rights, privileges, or obligations, without creating a reservation system or lengthy wardship or trusteeship, and without adding to the categories of property and institutions enjoying special tax privileges or to the legislation establishing special relationships between the United States Government and the State of Alaska[.]
43 U.S.C. § 1601(b). Following ANCSA’s passage, Congress repealed other statutes governing procurement of land for use by Alaska Natives, including the 1936 amendment authorizing the Secretary to designate reservations in Alaska. Federal Land Policy and Management Act of 1976, Pub. L. No. 94-579, § 704(a), 90 Stat. 2743, 2792. Importantly, however, Congress never repealed the IRA’s Alaska trust provision.
In 1978, a tribe’s request to take certain land into trust spurred the Department of Interior to determine ANCSA’s effect on its authority to acquire trust lands in Alaska. Concluding that “Congress intended permanently to remove from trust status all Native land in Alaska except allotments and the Annette Island Reserve,” Memorandum from Thomas W. Fredericks, Associate Solicitor, Indian Affairs, to Assistant Secretary, Indian Affairs 3 (Sept. 15, 1978) (“Fredericks Opinion”), Interior published regulations governing acquisition of Indian trust land that excluded “the acquisition of land in trust status in the State of Alaska,” a provision known as the “Alaska exception.” 25 C.F.R. § 151.1 (1980). It was this Alaska exception that stood in Akiac-hak’s way.
Akiachak filed the complaint in this case against the Secretary and the Department of Interior, seeking declaratory relief in the form of an order ruling that the Alaska exception violated the IRA’s antidiscrimi-nation provision, the Constitution, and the Administrative Procedure Act. . Compl. ¶¶ 54, 56, 58; id. Prayer for Relief ¶¶ I-III. Akiachak also sought an injunction directing Interior “to implement the acquisition of land into trust procedures without regard to the bar against Alaska tribes” and “to accept and consider Plaintiffs’ requests to have lands in Alaska taken into trust.” Id. Prayer for Relief ¶¶ IV-V.
The State of Alaska, seeking to defend the Alaska exception’s validity, intervened in the district court as a defendant. The *104 State filed an answer in which it presented several affirmative defenses, including that AMachak’s claims were “barred by the Alaska Native Claims Settlement Act.” State of Alaska’s Answer, Affirmative Defenses ¶ 3. The State’s answer also included a prayer for relief in which it requested “entry of a judgment ... declaring [the Alaska exception] compliant with [the IRA’s antidiscrimination provision],” “denying plaintiffs’ requested injunctive relief,” and “declaring [the Alaska exception] consistent with and compelled by the Alaska Native Claims Settlement Act.” Id. Prayer for Relief ¶¶ 1, 4, 6. Alaska’s answer included no purported crossclaim against Interior or counterclaim against Akiachak, nor did the State file any separate crossclaim or counterclaim.
In response to cross motions for summary judgment, the district court agreed with Akiachak that the Alaska exception violated the IRA and granted summary judgment in its favor. Akiachak I, 935 F.Supp.2d at 210-11. The court observed that the 1936 amendments to the IRA had expressly granted the Secretary authority to take land into trust in Alaska. Id. at 203. Akiachak argued — and Interior agreed— that such authority had survived ANCSA, while Alaska argued that ANCSA had “implicitly repealed the Secretary’s statutory authority to take Alaska land into trust outside of Metlakatla.” Id. at 203-04. Following thorough consideration of Alaska’s arguments, the district court concluded that “[f]rom the weight of the textual and structural evidence, and the strength of the presumption against implicit repeals, ... ANCSA left intact the Secretary’s authority to take land into trust throughout Alaska.” Id. at 208. The court then ruled that because the Alaska exception prevented the Secretary from considering trust petitions from non-Metlakatlan Alaska Natives, it violated the IRA’s antidiscrimi-nation provision. Id. at 210-11.
The district court then ordered the parties to brief the question of the appropriate remedy. Abandoning its claim to in-junctive relief, Akiachak urged the court to remand to the Secretary for “curative rule-making.” Akiachak Native Community v. Jewell (Akiachak II), 995 F.Supp.2d 1, 6 (D.D.C. 2013). Instead, the district court severed and vacated the portion of 25 C.F.R. § 151.1 that constituted the Alaska exception. Id. Vacatur was appropriate, the court concluded, because “the deficiencies of the Alaska exception [were] fatal; the Secretary could not promulgate it again on remand.” Id. Subsequently, the district court granted Alaska’s motion to enjoin Interior from taking any land into trust pending appeal. Akiachak Native Community v. Jewell (Akiachak III), 995 F.Supp.2d 7, 18-19 (D.D.C. 2014).
Although Interior initially appealed the district court’s judgment, it eventually decided to revise its regulations and drop its appeal. Specifically, it issued a proposed rule eliminating the Alaska exception, and sought comment on that course of action. 79 Fed. Reg. 24,648, 24,649 (May 1, 2014). Alaska filed comments in opposition and also filed a motion in the district court to enjoin the rulemaking. The district court denied the motion, noting that Alaska had never “argue[d] that the Proposed Rule or the rulemaking process itself [would] cause it irreparable harm,” and explaining that such processes could cause no such harm “[b]ecause the rulemaking process marks such a preliminary step, and one with limited consequences,” given that the court “ha[d] already severed the Alaska exception to the land into trust regulations.” Akiachak III, 995 F.Supp.2d at 15. Following the comment period, Interior then finalized the rule and removed the Alaska exception from its land-into-trust regulations. 79 Fed. Reg. 76,888 (Dec. 23, 2014). Noting that “[a] number of recent develop *105 ments ... caused the Department to look carefully at this issue again,” “including a pending lawsuit” and “urgent policy recommendations” from two blue-ribbon commissions, Interior “carefully reexamined the legal basis for the Secretary’s discretionary authority to take land into trust in Alaska” and concluded that “ANCSA left ... the Secretary’s ... land-into-trust authority in Alaska intact.” Id. at 76,889-90. According to Interior, “[t]he district court’s judgment in [Akiachak I] is consistent with the conclusion we reach but is not the basis for the Department’s decision to eliminate the Alaska Exception.” Id. at 76,891. Alaska has not challenged the new regulation.
After Interior issued the proposed rule suggesting the elimination of the Alaska exception, the Department voluntarily dismissed its appeal. It then filed a motion to dismiss Alaska’s appeal for lack of standing. Mot.' to Dismiss Intervenor State of Alaska’s Appeal 2 (July 18, 2014). After the new rule became final, Interior filed a separate motion seeking to dismiss Alaska’s appeal as moot, arguing that “[t]he district court’s judgment has now been overtaken by Interior’s administrative action to delete the regulatory language challenged in the complaint.” Federal Ap-pellees’ Mot. to Dismiss Appeal as Moot 2 (Oct. 8, 2015). Akiachak joined both motions. We thus have before us Alaska’s opposition to these motions and its argument on the merits, i.e., that ANCSA “precludes the creation of new trust land in Alaska.” Appellant’s Br. 32.
II.
“To qualify as a case fit for federal-court adjudication [under Article III, section 2], ‘an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed.’ ” Arizonans for Official English v. Arizona, 520 U.S. 43, 67, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997) (quoting Preiser v. Newkirk, 422 U.S. 395, 401, 95 S.Ct. 2330, 45 L.Ed.2d 272 (1975)). A case is moot “ ‘when the issues presented are no longer “live” or the parties lack a legally cognizable interest in the outcome.’ ” U.S. Parole Commission v. Geraghty, 445 U.S. 388, 396, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980) (quoting Powell v. McCormack, 395 U.S. 486, 496, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969)). These requirements ensure that federal courts exercise jurisdiction only over “questions presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process.” Flast v. Cohen, 392 U.S. 83, 95, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968).
In order to remain “live,” and thus justiciable, a case or controversy must retain at least one “claim for relief [that] remains viable, whether that claim was the primary or secondary relief originally sought.” Ramer v. Saxbe, 522 F.2d 695, 704 (D.C. Cir. 1975); see also Powell, 895 U.S. at 499, 89 S.Ct. 1944 (“rejecting] respondents’ theory that the mootness of a ‘primary’ claim requires a conclusion that all ‘secondary claims are moot”). The causes of action identified in the complaint perform the Article III function of restricting the court’s review to “a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.” Aetna Life Insurance Co. of Hartford v. Haworth, 300 U.S. 227, 241, 244, 57 S.Ct. 461, 81 L.Ed. 617 (1937).
As described above, Akiachak requested two forms of relief in the district court: a declaratory judgment that the Alaska exception violated the Constitution, the IRA, and the APA; and an injunction directing Interior to apply its land-into- *106 trust regulations to Alaska. Each cause of action challenged the validity of the Alaska exception. See Compl. ¶¶ 53-58. Because that regulation no longer exists, we can do nothing to affect Akiachak’s rights relative to it, thus making this case classically moot for lack of a live controversy. See, e.g., Burke v. Barnes, 479 U.S. 361, 363, 107 S.Ct. 734, 93 L.Ed.2d 732 (1987) (“[A]ny issues concerning whether [a bill] became a law were mooted when that bill expired by its own terms.”); Diffenderfer v. Central Baptist Church of Miami, Florida, Inc., 404 U.S. 412, 414-15, 92 S.Ct. 574, 30 L.Ed.2d 567 (1972) (per curiam) (“The only relief sought in the complaint was a declaratory judgment that the now repealed [statute] is unconstitutional as applied to a church parking lot used for commercial purposes and an injunction against its application to said lot. This relief is, of course, inappropriate now that the statute has been repealed.”). A similar situation arose in Larsen v. U.S. Navy, 525 F.3d 1, 4 (D.C. Cir. 2008), where we explained that “because the [agency has] already eliminated the [challenged] [p]oliey and plaintiffs never allege that the [agency] will reinstitute it, any injunction or order declaring it illegal would accomplish nothing — amounting to exactly the type of advisory opinion Article III prohibits.” Although the voluntary repeal of a regulation does not moot a case if there is reason to believe the agency will reinstitute it, “the mere power to reenact a challenged [rule] is not a sufficient basis on which a court can conclude that a reasonable expectation of recurrence exists” absent “evidence indicating that the challenged [rule] likely, will be reenacted.” National Black Police Ass’n v. District of Columbia, 108 F.3d 346, 349 (D.C. Cir. 1997). No such evidence exists here.
Alaska argues that this case remains live because we could, it says, provide it with two forms of effective relief: a declaration that ANCSA prohibits Interior from acquiring trust land in Alaska and an injunction prohibiting the agency from doing so. According to Alaska, it “pleaded for affirmative relief’ in the district court when it sought a ruling that the Alaska exception was valid. Appellant’s Reply Br. 3; see State of Alaska’s Answer, Prayer for Relief ¶¶ 1-3, 6 (requesting an “entry of judgment ... declaring 25 C.F.R. Part 151 compliant with [the IRA’s antidiscrimi-nation provision],” “constitutional,” and “consistent with and compelled by the Alaska Native Claims Settlement Act”).
Alaska’s argument ignores the restrictions that Article Ill’s case or controversy requirement places on the jurisdiction of the federal courts. As our decision in National Football League Players Ass’n v. Pro Football, Inc., 56 F.3d 1525 (D.C. Cir. 1995), vacated in part on other grounds, 79 F.3d 1215 (D.C. Cir. 1996), makes clear, the scope of a federal court’s jurisdiction to resolve a case or controversy is defined by the affirmative claims to relief sought in the complaint or, as may be the case, in any counterclaims or cross-claims. There, to determine whether the case had become moot, we looked only to the “relief requested by” the National Football League Players Association in a dispute over payment of union dues. Id. at 1529. Concluding that “the only relief for which the appellants prayed and which the District Court could have granted — suspension of [certain football] players for the remainder of the 1993-94 season — became impossible to grant” when the season ended, we held that the case had become moot because “the matter in dispute before the arbitrator, failure to pay fees for the 1993-94 season, could not be affected by the District Court by virtue of the limited relief sought by appellant.” Id. Although the Association argued that “the declaratory relief granted by the District Court” *107 would “have continuing effect on the relationship between the Players Association and the [team] and its players (and any similarly situated teams),” and thus that we could grant effective relief “by rescinding the declaratory order,” we explained that the narrow scope of relief requested in the district court meant that, as a legal matter, that court’s declaratory order affected only the 1993-94 season, which had already ended. Id.) see also Alton & Southern Railway Co. v. International Ass’n of Machinists & Aerospace Workers, 463 F.2d 872, 879-80 (D.C. Cir. 1972) (To prevent mootness, “there must be at least a capacity for a declaration of a legal right concerning a future projection of the actual dispute that precipitated the litigation.”).
The Supreme Court made the same point in Powell v. McCormack, noting that “the constitutional requirement of a case or controversy” is “supplied]” by “the ... issues presented” to the court, and that a case will remain justiciable only so long as at least one of those issues remains live. 395 U.S. at 497, 89 S.Ct. 1944. And in Diffenderfer v. Central Baptist Church of Miami, Florida, Inc., the Court concluded that a constitutional challenge to a repealed statute providing a tax exemption for church property was moot because no court could grant “[t]he only relief sought in the complaint,” namely, a declaratory judgment that the statute was unconstitutional and an injunction barring its application to the property in question. 404 U.S. at 414-15, 92 S.Ct. 574; see also Love v. Griffith, 266 U.S. 32, 34, 45 S.Ct. 12, 69 L.Ed. 157 (1924) (holding that a constitutional challenge to a rule prohibiting African Americans from voting in a past primary election was moot because “[t]he bill was for an injunction that could not be granted at that time,” and “[t]here was no constitutional obligation to extend the remedy beyond what was prayed”); Mills v. Green, 159 U.S. 651, 658, 16 S.Ct. 132, 40 L.Ed. 293 (1895) (finding a case moot where the plaintiff sought to participate in a constitutional convention that had already occurred, which made it “obvious ... that[ ] even if the bill could properly be held to present a case within the jurisdiction of the circuit court, no relief within the scope of the bill could now be granted”).
As noted above, Alaska intervened in the district court as a defendant and filed an answer that contained affirmative defenses and a prayer for relief, but nothing identified as a counterclaim or crossclaim. Alaska nonetheless insists that it “pleaded for affirmative relief’ when it “assert[ed] ... an affirmative defense that some or all of the Tribes’ claims are barred by ANCSA and requested] declaratory relief.” Appellant’s Reply Br. 3 & n.5. Under Federal Rule of Civil Procedure 8(c), however, affirmative defenses made “[i]n response] to a pleading” are not themselves claims for relief. True, Rule 8(c)(2) provides a potential mechanism for extending jurisdiction to an improperly pled claim: “[i]f a party mistakenly designates a defense as a counterclaim, or a counterclaim as a defense, the court must, if justice requires, treat the pleading as though it were correctly designated.” But several of our sister circuits have.held that a request for relief that amounts to no more than denial of the plaintiff’s demand is properly considered an answer, not a separate claim for affirmative relief that expands the court’s jurisdiction. See Riverside Memorial Mausoleum, Inc. v. UMET Trust, 581 F.2d 62, 68 (3d Cir. 1978) (“A counterclaim may entitle the defendant in the original action to some amount of affirmative relief; a defense merely precludes or diminishes the plaintiff’s recovery.”); Kleid v. Ruthbell Coal Co., 131 F.2d 372, 373 (2d Cir. 1942) (holding that a bankruptcy trustee’s objection to a creditor’s claim was an affirma *108 tive defense rather than a counterclaim because it was “h purely defensive pleading interposed against allowance of the claim” that allowed for no damages judgment in favor of the trustee and could not survive once the creditor’s claim was withdrawn); cf. National Surety Corp. v. Charles Carter & Co., Inc., 539 F.2d 450, 457 (5th Cir. 1976) (noting that, even if a contractor had not styled its claim for damages as a counterclaim, “the court could have considered the claim of offset in the original answer as a counterclaim” because the contractor “was entitled to judgment” of damages). These decisions suggest that Alaska presented only a defense, as in order to resolve Akiachak’s claim that the exception ran afoul of the IRA, the district court necessarily had to grapple with Alaska’s contrary argument that “the Alaska Native Claims Settlement Act ... implicitly repealed the Secretary’s authority to take most Alaska land into trust” and thus compelled the regulation. Akiachak II, 995 F.Supp.2d at 3. But even were we to construe Alaska’s pleading as asserting some independent claim, the only relief Alaska requested was a ruling that the Alaska exception was valid and compelled by the statute. State of Alaska’s Answer, Prayer for Relief ¶¶ 1-3, 6. As with Akiachak’s complaint, the subject of that purported claim — the Alaska exception — no longer exists, and so cannot continue to generate a live controversy.
Although Alaska never identifies the precise basis for its alleged independent claim to relief, the dissent takes matters into its own hands and contends that “Alaska affirmatively sought relief of its own by requesting ‘entry of a judgment ... declaring [the Alaska exception] consistent with and compelled by the Alaska Native Claims Settlement Act.’ ” Dissenting Op. at 116 (alterations in original) (quoting State of Alaska’s Answer, Prayer for Relief ¶ 6). “[F]rom the outset,” the dissent writes, “Alaska made clear its interests were unique and the Department could not be expected to adequately defend them.” Id. The dissent asserts that the phrase “compelled by” must have constituted an independent claim for relief because Interior’s argument that the Alaska exception was within its discretion “would have been sufficient to win the suit,” and thus Alaska must have been seeking “relief ... that was separate and distinct from merely winning the suit.” Id. at 116. “Alaska still has something to litigate even when the exception is no longer in force,” the dissent believes, “because Alaska seeks a declaration that the exception must be the law.” Id. at 119.
The dissent’s position suffers from several flaws. First, it conflates Rule 24(a)’s standard for intervention as of right, which requires merely that “the applicant show[ ] that representation of his interest may be inadequate,” a “minimal” “burden,” Trbovich v. United Mine Workers of America, 404 U.S. 528, 538 n. 10, 92 S.Ct. 630, 30 L.Ed.2d 686 (1972) (internal quotation marks omitted), with the presentation of an affirmative claim for relief. True, Alaska and Interior presented alternative defenses to Akiachak’s claims, but that demonstrates only that Alaska satisfied Rule 24(a), not that it asserted a claim against Interior. See Fund for Animals, Inc. v. Norton, 322 F.3d 728, 736 (D.C. Cir. 2003) (noting that “interests need not be wholly adverse before there is a basis for concluding [under Rule 24(a) ] that existing representation of a different interest may be inadequate” (internal quotation marks omitted)). Interior and Alaska each offered statutory interpretations that, if correct, would have resulted in nothing more than denial of the relief Akiachak sought, albeit for different reasons. Thus, both responses were defenses. The dissent insists that Alaska did something distinct from satisfy *109 ing Rule 24(a) when it “asserted a different affirmative position than what the Department advanced.” Dissenting Op. at 118. But this court has squarely held that Rule 24(a) is designed to allow intervention on the ground that the intervening party seeks to make a legal argument not pursued by a named party — -just what happened here. Dimond v. District of Columbia, 792 F.2d 179, 193 (D.C. Cir. 1986) (holding that an insurance company could intervene as a defendant under Rule 24(a) in part because the government could not be expected “to make the same legal arguments that [the company] would make”); see also Building & Construction Trades Department, AFL-CIO v. Reich, 40 F.3d 1275, 1282 (D.C. Cir. 1994) (holding that an employer’s motion to intervene as a defendant was properly denied under Rule 24(a) when the employer “offered no argument not also pressed by” the government).
Second, the dissent would have us read some unspecified claim to relief into the phrase “compelled by” in Alaska’s answer. See Dissenting Op. at 115-16. But these words cannot bear the weight the dissent places upon them. For one thing, it is difficult to discern what Alaska’s cause of action would have been at the time it filed the answer which, according to the dissent, pled an affirmative claim to relief against Interior. It could not have been the APA, as in its opposition to Akiachak’s motion for summary judgment, Alaska argued that no “action by the Secretary associated with the land into trust rule has been arbitrary, capricious, or an abuse of discretion,” State of Alaska’s Opp’n to Pl.’s Cross-Mot. for Summ. J. Re ANCSA and Reply in Supp. of Alaska’s Mot. for Summ. J. (“Alaska Summ. J. Opp’n”), Dkt. No. 85, at 39-40 (Jan. 8, 2009), and urged the district court to conclude that “the record demonstrates that the Secretary has acted appropriately in maintaining the regulatory prohibition against taking land into trust in Alaska,” id. at 115-16.
Nor had Interior taken any final action that was contrary to Alaska’s interpretation of ANCSA. Indeed, as far as Alaska knew when it filed its answer, Interior still believed that ANCSA prohibited the Secretary from taking any Alaska land into trust. Interior’s answer — the only document the Department had filed at that time — contained no assertion that the Alaska exception was discretionary. See Answer of the United States to Pis.’ Compl., Dkt. No. 17 (Nov. 27, 2007). The dissent believes that because Interior “had publicly rescinded the Fredericks Opinion,” “Alaska knew the Department no longer defended the Alaska exception as being compelled by ANCSA.” Dissenting Op. at 118. But throughout the proceedings in the district court, Alaska argued that “[s]ince the enactment of ANCSA in 1971, the Secretary’s formal position consistently and admittedly has been that ANCSA precludes him from taking land into trust in Alaska.” State of Alaska’s Resp. to Defs.’ Supplemental Br. Pursuant to Court’s Order (“Alaska Supplemental Br.”), Dkt. No. 103, at 6-7 (Aug. 15, 2012). Alaska expressly acknowledged the withdrawal of the Fredericks Opinion, but accorded it little weight. See Alaska Summ. J. Opp’n 42-45 (arguing that although Interior had withdrawn the Fredericks Opinion, the withdrawal memorandum and another prior Solicitor opinion “indieat[ed] that the Solicitor himself understood that the Secretary’s discretion to take land into trust in Alaska may be curbed by law”). As Alaska recognized in its district court briefs — and as the dissent itself acknowledges, see Dissenting Op. at 122 — the State’s disagreement with Interior regarding the legal effect of ANCSA developed during the litigation of Akiachak’s claim. See Alaska Supplemental Br. 4 (“The Secretary first adopted the position that *110 ANCSA permitted him to take land into trust in Alaska during this litigation.”)- It is therefore difficult to comprehend how, at the time Alaska filed its answer, it could have intended that disagreement to serve as the basis for an affirmative claim for relief against Interior.
The dissent’s theory requires such speculation in part because Alaska never asked the district court to construe anything in its answer as an affirmative claim under Rule 8(c)(2), nor did it do anything to suggest that it intended to bring any such claim. In fact, quite the opposite. As noted above, Alaska’s answer was solely responsive: the State neither presented a cross-claim nor pled facts even suggesting that Interior had acted impermissibly or bore some statutory duty to promulgate regulations enforcing Alaska’s reading of ANC-SA. See Rundgren v. Washington Mutual Bank, FA, 760 F.3d 1056, 1061 (9th Cir. 2014) (“A ‘claim’ is a cause of action or the aggregate of facts that gives rise to a right to payment or an equitable remedy.” (citing Black’s Law Dictionary 281-82 (9th ed. 2009))). And in its motion to intervene, Alaska argued only that “certain affirmative defenses apply to the state that cannot be advanced by the federal defendants.” Alaska’s Mem. of Points and Authorities in Supp. of Its Mot. to Intervene, Dkt. No. 18, at 3 (Nov. 27, 2007). Far from asserting its own claim, Alaska expressly recognized that “[a]t the heart of 'plaintiffs’ case lies the question of whether [ANCSA] continues to justify the regulatory bar prohibiting the Department of Interior ... from applying the land into trust regulations in Alaska.” Alaska’s Reply Mem. in Supp. of Its Mot. to Intervene, Dkt. No. 24, at 1 (Dec. 17, 2007) (emphasis added). Critically, at the very end of the proceedings in the district court, Alaska described the case this way in its motion for reconsideration:
In this case, Plaintiffs have challenged only the regulatory bar that prohibits Alaska tribes from petitioning the Secretary under 25 C.F.R. Part 151 to have land taken into trust. The parties have briefed the legal issues pertaining to that prohibition, and the Court has found it invalid. No other provision of the regulation has been challenged, and no issues other than its legality have been briefed for the Court’s consideration.
Mem. in Supp. of State of Alaska’s Mot. for Recons., Dkt. No. 112, at 11-12 (Apr. 17, 2013) (footnote omitted). In its briefing here, moreover, Alaska neither cites Rule 8(c)(2) nor refers to anything it did in the district court as raising a “claim.” The State argues only that it “assert[ed] ... an affirmative defense” and “requested” and “pleaded for affirmative relief.” Appellant’s Reply Br. 3 & n.5. If Alaska knew all along it was asserting a claim, one would have thought it would have used that term in its briefs.
Equally telling, no one in the district court — not even the court itself — seemed to think otherwise. Interior filed neither a pleading in response to the claim the dissent finds apparent on the face of Alaska’s answer, nor any response to Alaska’s summary judgment motion. Alaska filed no motion for default on any claim, which would have been the proper course of action once Interior failed to respond. Meanwhile, AMachak filed and briefed a motion for summary judgment against Alaska regarding ANCSA’s meaning. See Dkt. Nos. 83, 88. And contrary to the dissent’s belief that it was “apparent to the district court” that Alaska had brought an affirmative claim to relief, Dissenting Op. at 116, the district court never even hinted that it was rendering judgment, or needed to render judgment, on any affirmative claim raised by Alaska. For instance, in its order requesting supplemental briefing, the district *111 court referred to the “plaintiffs[’] ... challenge [to] the regulations governing the acquisition of land by the United States in trust status for individual Indians and tribes,” but mentioned no other claim. Dkt. No. 99, at 1 (Apr. 30, 2012).
We engage in this lengthy response to the dissent to demonstrate the difficulty of drawing any conclusion other than that, until filing its reply brief in this court, Alaska seems to have thought it was merely defending against Akiachak’s claims. The dissent provides no reason not to take Alaska at its word. See National Union Fire Insurance Co. of Pittsburgh, Pa. v. City Savings, F.S.B., 28 F.3d 376, 393 (3d Cir. 1994) (“[I]t is clear that a defense or affirmative defense is not properly called an . ‘action’ or a ‘claim’ but is rather a response to an action or a claim. When a lawyer files a responsive pleading to an action or claim, she does not say that she is bringing an action or filing a claim; instead, she says that she is answering, responding to, or defending against an action.”). Moreover, even under the dissent’s theory, we could take Alaska’s failure to raise before the district court any suggestion that the court- had misconstrued its pleading as the final nail in the coffin of any claim Alaska now purports to have pled. See 889 Orange Street Partners v. Arnold, 179 F.3d 656, 664 (9th Cir. 1999) (declining to construe a labeled crossclaim as an affirmative defense under Rule 8(c)(2) because appellant never presented the argument “until oral argument on this appeal,” and “if [his] attorneys did not discover this argument until now, the district court should not be expected to have done so for them”).
The dissent also relies on the fact that once the case reached this court our Clerk’s Office designated Alaska as “appellant” and Interior and Akiachak as “ap-pellees.” See Dissenting Op. at 116-17. But a careful look at the procedural history of this case belies any support for the dissent’s insistence that “Alaska all along has raised a claim against which the Department has thought necessary to defend.” Id. at 117. Alaska and Interior each filed separate notices of appeal, on November 29, 2013, and December 3, 2013, respectively. This court consolidated the cases on December 20, 2013. Under the Clerk’s Office’s routine docketing procedures, any party involved in the original litigation other than the party filing the notice of appeal is automatically designated as an appellee in that appeal without any analysis of the parties’ legal adversity, even if one of those parties has filed a separate notice of appeal. When Interior voluntarily dismissed its appeal, it left only Alaska’s originally filed appeal and the docket entries accompanying that appeal, which had automatically identified Interior as an ap-pellee. These docketing procedures are therefore irrelevant. To the extent the dissent relies on Alaska’s intent to establish Interior as an adverse party, Alaska informed the court in its certificate as to the parties, rulings, and related cases, filed after consolidation, that “Appellants are the State of Alaska (case 13-5360) and the ... Department of Interior[ ] and ... [the] Secretary of the Interior (case 13-5361).” Certificate as to the Parties, Rulings and Related Cases by the State of Alaska 1 (Jan. 21, 2014). Alaska listed only Akiachak and the other tribal litigants as “Appellees.” Id.’, see also Statement of Issues by Appellant State of Alaska 1 (Jan. 21, 2014) (captioning Alaska and Interior both as appellants). As noted above, it was not until after Alaska filed its answer in the district court that the State and Interi- or made different arguments regarding ANCSA’s effect. Even so, it is unsurprising that, even once those differing positions became clear, Alaska made no suggestion that it had become legally adverse *112 to Interior; after all, at that time, both parties continued to defend the regulation’s legality, a circumstance that changed only midway through this appeal. In any event, that Alaska and Interior eventually became adverse to one another says nothing about whether Alaska presented a crossclaim against Interior in its original answer.
This brings us, then, to Alaska’s argument that its appeal remains live because Interior’s rulemaking cannot alter the meaning of ANCSA and thus “the new regulation cannot displace the central legal question in this appeal: whether ANCSA prohibits the creation of new trust land in Alaska,” an issue over which “[t]here is still a present, live controversy.” Appellant’s Reply Br. 4 (internal quotation marks omitted). Essentially, Alaska argues that by ruling on the meaning of the statute and vacating the Department’s rule, the district court effectively eliminated the Department’s power to take any action that could moot the case. Alaska relies on our decision in Williams v. Washington Metropolitan Area Transit Commission, 415 F.2d 922, 940 (D.C. Cir. 1968) (en banc), in which we invalidated a rate order but declined to remand to the agency to allow for promulgation of a new order because the Commission “possesse[d] no authority to fix” rates retroactively. But Alaska cannot expand our jurisdiction by relying on Williams. That decision never addressed mootness, and Alaska points to no case law distinguishing between remand and vacatur of agency rules for mootness purposes. Indeed, in an analogous situation, the Tenth Circuit in Wyoming v. USDA, 414 F.3d 1207, 1212 (10th Cir. 2005), found that rescission of a permanently enjoined regulation mooted a lawsuit challenging the regulation because “[t]he portions of the [regulation] that were substantively challenged by [the plaintiff] no longer exist.” As explained above, the same is true here.
Although acknowledging that Wyoming “would be analogous to the present circumstances if ... the only claim to be appealed was what Akiachak stated in the original complaint,” the dissent nonetheless believes that because the district court vacated the Alaska exception, Interi- or’s “subsequent curative rulemaking was an absurdity” that “created no legal effect.” Dissenting Op. at 119. Thus, the dissent asserts, “what the court really means is that the district court mooted this case when it vacated the Alaska exception,” a decision it characterizes as “nonsensical.” Id. at 120. But Interior did far more than merely acquiesce in the district court’s judgment. Instead, it engaged in a new rulemaking, in which it considered the history of trust ownership in Alaska, its prior legal interpretations of the governing statutes, policy issues such as public safety in Alaska Native communities, comments from Native communities and corporations, and the recommendations of blue-ribbon commissions formed to “investigate criminal justice systems in Indian Country” and “evaluate the existing management and administration of the trust administration system.” 79 Fed. Reg. at 76,889-92. Interior then exercised its discretion to promulgate a new rule that removed the Alaska exception, explaining that the new rule could “foster economic development, enhance the ability of Alaska Native tribes to provide services to their members, and give additional tools to Alaska Native communities to address serious issues, such as child welfare, public health and safety, poverty, and shortages of adequate housing, on a local level.” Id. at 76,892. Significantly, Interior made clear that “[t]he district court’s judgment ... is not the basis for the Department’s decision to eliminate the Alaska Exception” and that it had “independently con- *113 eluded that there is no legal impediment to taking land into trust in Alaska, and there are sound policy reasons for giving Alaska tribes the opportunity to petition to take land into trust.” Id. at 76,891. As in Wyoming, it was this action by Interior, not the district court’s decision to vacate the regulation — a decision that was, of course, on appeal — that mooted this case.
In sum, once the Department of Interior rescinded the Alaska exception, this case became moot. Even assuming, as Alaska argues, that the district court’s interpretation of ANCSA injured the State, such injury cannot extend our jurisdiction by creating a new controversy on appeal. In essence, Alaska urges us to “entertain the appeal so as to advise the parties of what their rights would be in what is essentially a new legal controversy” — whether Interi- or’s 2014 rule correctly interprets ANCSA. Alton & Southern Railway Co., 468 F.2d at 879. We are without jurisdiction to provide such an advisory opinion. Assuming Alaska’s claim is ripe, we see no barrier to the State raising it directly under the APA, see, e.g., Harris v. FAA, 353 F.3d 1006, 1009 (D.C. Cir. 2004) (noting the six-year statute of limitations on APA claims), or if and when Interior attempts to take any land into trust in Alaska, see, e.g., NLRB Union v. Federal Labor Relations Authority, 834 F.2d 191, 195 (D.C. Cir. 1987) (noting that a party against whom a regulation is applied could challenge that regulation as a “defense in an enforcement proceeding” or other “further agency action applying it” (internal quotation marks and alteration omitted)).
What the dissent thinks is a “catastrophic result” flows from our application of a perfectly uncontroversial and well-settled principle of law, namely, when an agency has rescinded and replaced a challenged regulation, litigation over the legality of the original regulation becomes moot. See, e.g., Initiative & Referendum Institute v. U.S. Postal Service, 685 F.3d 1066, 1074 (D.C. Cir. 2012) (finding a challenge to a Postal Service regulation moot where the agency had “beat [the appellants] to the punch by amending the regulation to exempt” the challenged activity); Coalition of Airline Pilots Ass’ns v. FAA, 370 F.3d 1184, 1190 (D.C. Cir. 2004) (finding a due process challenge to a regulation moot where the agency had abandoned the regulation and “committ[ed] ... to provide ... greater procedural rights”); National Mining Ass’n v. U.S. Department of Interior, 251 F.3d 1007, 1010-11 (D.C. Cir. 2001) (declaring a challenge to a revised rule moot, noting that “[t]he old set of rules, which are the subject of this lawsuit, cannot be evaluated as if nothing has changed” because “[a] new system is now in place” and “[a]ny opinion regarding the former rules would be merely advisory”); Arizona Public Service Co. v. EPA, 211 F.3d 1280, 1295-96 (D.C. Cir. 2000) (holding moot a challenge to an EPA rule after the agency issued a “clarification” altering the regulation); Freeport-McMo-Ran Oil & Gas Co. v. FERC, 962 F.2d 45, 46 (D.C. Cir. 1992) (finding a case “plainly moot” where the challenged agency order had been “superseded by a subsequent order,” and noting that such an occurrence was so routine that “[o]rdinarily, we would handle such a matter in an unpublished order”). In all such cases, moreover, if the agency promulgates a new regulation contrary to one party’s legal position, that party may “cure[] its mootness problem by simply starting over again,” Dissenting Op. at 120 — by challenging the regulation currently in force. See, e.g., Freeport-McMo-Ran Oil & Gas Co., 962 F.2d at 46 (noting that a petitioner’s opposition to a superseded order was “appropriately resolved either upon review of [the new] order ... or in [a] complaint proceeding”); Gulf Oil Corp. v. Simon, 502 F.2d 1154, 1156 *114 (Temp. Em. Ct. App. 1974) (“This suit sought equitable relief from particular regulations and proceeded to judgment on that controversy. If new considerations provide a basis for challenging the validity of significantly different superseding regulations that now are in effect, that can appropriately be done in a new suit. Otherwise, an unending series of post-judgment controversies about new subject matter could be litigated under the umbrella of a suit already fully considered and decided”). Although the dissent seems to disapprove of agencies’ ability to moot challenges to regulations, see Dissenting Op. at 121, such authority is in fact so fundamental to judicial economy that it serves as the animating principle underlying the administrative exhaustion doctrine: “The basic purpose of the exhaustion doctrine is to allow an administrative agency to perform functions within its special competence — to make a factual record, to apply its expertise, and to correct its own errors so as to moot judicial controversies.” Parisi v. Davidson, 405 U.S. 34, 37, 92 S.Ct. 815, 31 L.Ed.2d 17 (1972). Indeed, this court has criticized an agency for failing to formally remove certain superseded orders from its books because doing so would “sav[e] time, energy, and money, allow[ ] the parties to focus their attention on review of the [new] order, and alIow[] the court to focus on live cases and controversies instead of this moot one.” Freeport-Mc-MoRan Oil & Gas Co., 962 F.2d at 47. We went so far as to note that we issued an opinion on the issue specifically “to express our displeasure with [agency] counsel’s failure to take easy and obvious steps to avoid needless litigation.” Id.
The dissent makes several other points that require little response. First, it contends that “in attacking the rulemaking directly, Alaska will be forced to confront a standard of review highly deferential to the Department,” — that is, Chevron deference — allowing Interior to “run the table.” Dissenting Op. at 120. This argument is difficult to fathom, as, according to the dissent, Alaska would find itself in precisely the same position in a new suit as it was here: bringing an affirmative claim to relief that Interior was “compelled” to promulgate regulations enshrining one particular interpretation of ANCSA. More important, the dissent never explains why Chevron would apply to one ease but not the other. See Federal Appellees’ Br. 24 (arguing that Chevron applies to Interior’s interpretation of ANCSA). Next, the dissent asserts that once this appeal ends, “the Department will be free to take Alaskan lands into trust.” Dissenting Op. at 121. It is true that when the district court lifts its stay, the Department could move to take land into trust in Alaska, but it is hardly “free” to do so. Quite to the contrary, Interior will have to comply with its land-into-trust regulations, which establish a multi-step process requiring the Department to consider, among other things, jurisdictional conflicts and the effect of any acquisition on state and local governments, 25 C.F.R. § 151.11(a); engage in notice and comment on any proposed acquisition, id. § 151.11(d); and issue a written decision, id. § 151.12 — a decision subject to judicial review, see Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak, — U.S. -, 132 S.Ct. 2199, 2204-10, 183 L.Ed.2d 211 (2012) (holding that sovereign immunity did not bar review of a trust decision and noting that challenges to such actions on the ground that “the Secretary’s decision to take land into trust violates a federal statute” are reviewable under the APA). Finally, according to the dissent, “[t]he issues presented” in this case “are of great significance” to the parties. Dissenting Op. at 121. Undoubtedly so. But no matter how important an issue, *115 courts may not decide cases over which they have no Article III jurisdiction.
III.
This brings us, finally, to the question of whether we should vacate the district court’s decision. All parties urge us to do so, and we agree. The Supreme Court has instructed courts to “dispose! ] of moot cases in the manner ‘most consonant to justice ... in view of the nature and character of the conditions which have caused the case to become moot.’ ” U.S. Bancorp Mortgage Co. v. Bonner Mall Partnership, 513 U.S. 18, 24, 115 S.Ct. 386, 130 L.Ed.2d 233 (1994) (alteration in original) (quoting United States v. Hamburg-Amerikanische Packetfahrt-Actien Gesellschaft, 239 U.S. 466, 477-78, 36 S.Ct. 212, 60 L.Ed. 387 (1916)). Because Alaska is “the party seeking relief from the judgment below,” id. and has been prevented from appealing the district court’s decision for reasons outside its control, vacatur is appropriate to “clear[ ] the path for future relitigation of the issues ... and eliminate! ] a judgment, review of which was prevented through happenstance.” United States v. Munsingwear, Inc., 340 U.S. 36, 40, 71 S.Ct. 104, 95 L.Ed. 36 (1950).

So ordered.